26-MJ-1431-1434-DLC

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A BLACK IPHONE WITHOUT A CASE WITH A GRAY/SILVER APPLE LOGO, WHICH HAS SIGNIFICANT CRACKS (DEA EXHIBIT N-60) SEIZED FROM 59 MONSIGNOR PATRICK J. LYDON WAY, APT. 104, BOSTON, MA. ON DECEMBER 5, 2024;<br><br>IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A BLACK IPHONE WITH A CLEAR CASE WITH A GRAY/SILVER APPLE LOGO (DEA EXHIBIT N-61) SEIZED FROM 59 MONSIGNOR PATRICK J. LYDON WAY, APT. 104, BOSTON, MA. ON DECEMBER 5, 2024;<br><br>IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A WHITE/SLIGHTLY PINK IPHONE WITH A CLEAR CASE WITH A GRAY/SILVER APPLE LOGO (DEA EXHIBIT N-62) SEIZED FROM 59 MONSIGNOR PATRICK J. LYDON WAY, APT. 104, BOSTON, MA. ON DECEMBER 5, 2024; AND<br><br>IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A WHITE IPHONE WITH A SLIGHTLY PATTERNED CASE THAT HAS RHINESTONES AROUND THE EDGE OF THE CASE (DEA EXHIBIT N-63) SEIZED FROM 59 MONSIGNOR PATRICK J. LYDON WAY, APT. 104, BOSTON, MA. ON DECEMBER 5, 2024 | M.J. Nos. 26-1431-DLC<br>26-1432-DLC<br>26-1433-DLC<br>26-1434-DLC |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS**

I, Brian Connerney, being sworn, state:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed as an Arlington Police Officer since 2000. I have held the rank of Inspector since 2005. Since March of 2012, I have been assigned as a deputized Task Force Officer of the United States Drug Enforcement Administration ("DEA"). I am a graduate of the Canton, Massachusetts Municipal Police Academy.

2. As an Arlington Police Inspector and DEA Task Force Officer, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received training regarding narcotics investigations while attending the police academy and have attended additional specialized training courses in furtherance of my past and current assignments, including the Basic Narcotic Investigation course conducted and presented by the DEA training staff.

3. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. I have also been an affiant and case agent for a large-scale investigation involving the interception of court-ordered wire interceptions. Through my training and experience, I have become familiar

with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4. Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection and often use text messages in lieu of phone calls to avoid speaking over the telephone.

**PURPOSE OF AFFIDAVIT**

5. I submit this affidavit in support of applications for search warrants under Federal Rule of Criminal Procedure 41 to search the following devices:

a. A black iPhone (DEA Exhibit N-60), seized from the residence of Mariela Cuello-Reynoso during the execution of a federal search warrant at 59 Monsignor Patrick J. Lydon Way, Apartment 104, Boston, Massachusetts, on December 5, 2024 ("Target Device 1"), which is further described in Attachment A-1;

b. A black iPhone (DEA Exhibit N-61), seized from the residence of Mariela Cuello-Reynoso during the execution of a federal search warrant at 59 Monsignor Patrick J. Lydon Way, Apartment 104, Boston, Massachusetts, on December 5, 2024 ("Target Device 2"), which is further described in Attachment A-2;

c. A white/slightly pink iPhone (DEA Exhibit N-62), seized from the residence of Mariela Cuello-Reynoso during the execution of a federal search warrant at 59 Monsignor Patrick J. Lydon Way, Apartment 104, Boston, Massachusetts, on

December 5, 2024 ("Target Device 3"), which is further described in Attachment A-3;

d. A white iPhone (DEA Exhibit N-63), seized from Mariela Cuello-Reynoso during the execution of a federal search warrant at 59 Monsignor Patrick J. Lydon Way, Apartment 104, Boston, Massachusetts, on December 5, 2024 ("Target Device 4"), which is further described in Attachment A-4;

(Collectively, the "Target Devices.") The Target Devices are currently in the possession of law enforcement investigators, as described in Attachments A-1 through A-4. There is probable cause to believe that the Target Devices contain evidence, fruits, and instrumentalities of the violations of federal law, including distribution and possessions with intent to distribute controlled substances, in violation of 21 U.S.C. § 841 and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846 (the 'Target Offenses"), as described in Attachment B.

6. The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. This affidavit is intended to show that there is probable cause for the requested search warrants and does not set forth all of my knowledge about this matter. All times herein are approximate.

## PROBABLE CAUSE

*A, Procedural Background*

7. On November 6, 2024, MARIELA CUELLO-REYNOSO and others (hereinafter "MARIELA") were charged by criminal complaint with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846. *See* No. 24-MJ-1592-DLC.

8. On December 4, 2024, the Honorable Donald L. Cabell, United States Magistrate Judge, issued a warrant to search the residence of MARIELA, among others, which was Apartment 104 at 59 Monsignor Patrick J. Lydon Way in Boston Massachusetts. *See* No. 24-MJ-1664-DLC, herein incorporated by reference. That warrant, specifically Attachment A-2, described the property and included certain cell phones located therein. Attachment B-2 listed the items to be seized.[1] See Attachment C.

9. On December 5, 2024, at about 6:00 a.m., federal agents executed the warrant to search Apartment 104 at 59 Monsignor Patrick J. Lydon Way. The residence at 59 Monsignor Patrick J. Lydon Way was a two-bedroom apartment. Inside the apartment, agents encountered two people: defendant MARIELA and her minor child. During the search of MARIELA's bedroom, agents located Target Device 1 on the nightstand, Target Device 2 on the nightstand, and Target Device 3 on the dresser. Agents discovered Target Device 4 in the possession of MARIELA. The Target Devices were all seized.

10. Based on my training and experience, drug traffickers commonly use multiple cell phones to conduct their drug trafficking activity. Additionally, in this matter, agents had specific information regarding MARIELA's use of multiple cellular telephones during the course of the investigation, on which she discussed her narcotics trafficking activity. Accordingly, the fact that MARIELA had multiple cellphones in her bedroom and in her possession on December 5, 2024, is, in my experience, independent evidence of her drug trafficking offense (regardless of their

---

[1] It appears, upon review, that Attachment B-2, which was relevant to this search, provided for the seizure of cellular telephones used by Yulial Cuello-Reynoso and Yordania Cuello-Reynoso and not specifically, the cellular telephones of Mariela Cuello-Reynoso.

contents), and the Target Devices have been maintained in DEA evidence for that purpose. *See* United States v. Henry, 827 F.3d 16 (1st Cir 2016).

11. The Target Devices were transported to the New England Field Division that day and have been securely maintained pursuant to DEA procedures since that date. On September 23, 2026, the evidence bags were opened, in accordance with DEA policy, and the telephones were photographed, for purposes of requesting this warrant.

12. On December 5, 2024, MARIELA was arrested, pursuant to an arrest warrant, had an initial appearance, and was released on conditions.

13. On February 18, 2025 a grand jury sitting in Boston returned an indictment charging MARIELA and twenty-three others with conspiracy to distribute and possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841 and 846.

*B. Evidence of MARIELA's Participation in Criminal Conspiracy and Use of Multiple Cellular Telephones in Furtherance of Her Drug Trafficking Activities*

14. In March 2022, law enforcement officers began making a series of undercover purchases of fentanyl from a drug distribution organization led by Yulial CUELLO-REYNOSO a/k/a "Sonny" (hereinafter "CUELLO-REYNOSO"). Ultimately, the investigation involved twenty-nine undercover purchases of drugs. The undercover ("UC") purchases of drugs showed that CUELLO-REYNOSO and others operated a customer telephone, which telephone number changed over the course of the investigation, to take drug orders from customers. The organization then dispatched distributors to deliver the drugs to the customers. During each of the UC purchases, the UC contacted the customer telephone and requested in coded language to purchase a quantity of fentanyl. The UC was provided with an address at which to meet a distributor. At that address, the UC met with a distributor for the target organization, gave that distributor payment for the requested drugs, and received the drugs from the distributor.

15. Beginning in March 2023, investigators obtained authorization to intercept communications over telephones used by members of the CUELLO-REYNOSO drug trafficking organization ("DTO"). Investigators conducted court-authorized interception of 15 telephones during the course of this investigation. Two of the telephones intercepted were used by MARIELA, specifically telephone number (920) 853-8060 (Target Telephone # 10) and telephone number (617) 690-9031 (Target Telephone # 11).

16. Interceptions over the various Target Telephones confirmed that the DTO used a customer telephone to take drug orders and a runner dispatch telephone to coordinate delivery of the drugs. Interceptions also showed that the organization employed multiple drug distributors simultaneously; used multiple stash locations to process, package, and store drugs and drug proceeds; used dedicated vehicles for distributors; transported drugs in hidden compartments and in socks concealed in the engine compartments of the vehicles; used a color-coded system to differentiate between types of drugs within packaging; and changed telephone numbers very frequently in an attempt to avoid law enforcement detection.

17. MARIELA is CUELLO-REYNOSO's sister and was romantically involved with Jorge VIZCAINO (hereinafter "VIZCAINO"). Based on the evidence in the case, I believe that MARIELA maintained a stash location at her residence at 59 Monsignor Patrick J. Lydon Way in Boston in the Spring, 2024. MARIELA also worked at a stash location processing and distributing drugs to other members of the organization. MARIELA also distributed drugs on behalf of CUELLO-REYNOSO. During this investigation, MARIELA used six separate telephone numbers, which were intercepted during the course of the wire interceptions. Specifically, she used the following telephone numbers: (508) 921-2813; (978) 629-6190; (479) 487-3933; (857) 407-5393; Target Telephone # 10; and Target Telephone # 11.

18. The following are examples of MARIELA's criminal culpability as well as her use of varied telephones in furtherance of her narcotics trafficking activities.

*On May 2, 2024, MARIELA Texted VIZCAINO Regarding Narcotics Trafficking Activities*

19. On May 2, 2024, at 1:18 a.m., agents intercepted a text message on Target Telephone #9, used by VIZCAINO, from telephone number (479) 487-3933, used by MARIELA. The text message stated "Send me the amount/tab please."

20. I believe that MARIELA was texting VIZCAINO and asking him to provide her with an accounting of the amount of narcotics that he had distributed and/or the amount of money that he had collected that day distributing narcotics.

*On May 3, 2024, VIZCAINO and MARIELA Discussed MARIELA's Operation of a Stash House.*

21. On May 3, 2024, at 3:44 p.m., agents intercepted a call over Target Telephone #9 during which VIZCAINO spoke with MARIELA, who was using telephone number (617) 690-9031 (Target Telephone # 11). During the call, MARIELA said, "There was one that was missing a few. How many blues do you have left?" VIZCAINO said, "I don't know." MARIELA then said, "He needs to designate someone to be here, because I can't be doing that, because I don't want to be taking shit from him. He knows I shouldn't be in here. I think I accidentally gave you what I was supposed to give Menor. There is some food in there that is complete." VIZCAINO then said, "I sold six blue." MARIELA then continued, "I have been in here all week alone, and I can't handle that." VIZCAINO said, "For someone to take care of that, it has to be someone in charge of only that, without having to go in and out all the time. The job is better for men, instead of women. When I used to be in charge of that, I had to stay there late waiting for the stuff to dry. It was the same when we were in Roxbury and had to

make crack." MARIELA said, "The smell in here makes me lose my appetite." MARIELA then asked VIZCAINO if he opened "the thing to check" and asked, "Did you take out from the car what you were supposed to grab before you arrived?" VIZCAINO said there was a lot of traffic and that he would call her later because he was going to do something.

22. I believe that during this call, MARIELA asked VIZCAINO how many bags of powder cocaine ("blues") he had left. I believe that MARIELA then complained that she was working in the stash house and said that CUELLO-REYNOSO knew that she should not be there and that he needed to hire someone else to keep inventory and manage the drug stash. I believe that MARIELA was concerned that she had not correctly kept track of the drug inventory and had given drugs to VIZCAINO that had been meant for Rafael CONCEPCION ("I think I accidentally gave you what I was supposed to give Menor."). I believe that VIZCAINO opined that it was important to have a stash house operator that did not have other responsibilities ("For someone to take care of that, it has to be someone in charge of only that"). I believe that VIZCAINO then discussed the time consuming nature of processing the drugs for distribution, including making crack cocaine and waiting for the drugs to dry after they were cooked into crack, and that MARIELA stated that the smell of the drugs in the stash house was making her sick to her stomach.

*May 5, 2024, MARIELA Told VIZCAINO About Narcotics She Had at the Stash Location*

23. On May 5, 2024, at 10:15 a.m., agents intercepted a call over Target Telephone #9 during which VIZCAINO spoke to MARIELA, who was using telephone number (479) 487-3933. During the call, MARIELA started counting and then stated, "15 green and 20 red" and "20 big, 6 black, 20 red, 9 blue, 2 big green, and a big blue."

24. I believe that during this call MARIELA was at the stash house and was counting quantities of drugs that were present with her at the stash house and was relaying said information to VIZCAINO via telephone, specifically that there were "15 green," which is a reference to 15 packages of crack cocaine; "20 red," which is a reference to 20 packages of fentanyl; "20 big," which is a reference to 20, 2.5 gram of fentanyl packages or 50 grams of fentanyl; "6 black," which is a reference to 6, 2 gram packages of crack cocaine or 12 grams of crack cocaine; "9 blue," which is a reference to 9, .5 gram packages of cocaine or 4.5 grams of cocaine; "2 big green," which is a reference to 2, 2.5 gram packages of crack cocaine or 5 grams of crack cocaine; and "a big blue," which is a reference to one, 3.5 gram package of cocaine. The organization used a color-coded system throughout this investigation to keep track of the quantity and types of narcotics that were being processed and distributed by varied members of the organization.

*On May 5, 2024, VIZCAINO Spoke with MARIELA About Cocaine He Had Received from the Stash.*

25. On May 5, 2024, at 5:21 p.m., agents intercepted a call over Target Telephone #9 during which VIZCAINO spoke with MARIELA, who was using telephone number (479) 487-3933. During the call, MARIELA stated that "Sonny" had just left her place. VIZCAINO subsequently asked, "Who prepared these balls? They have a different number." MARIELA asked, "What was that?" and VIZCAINO repeated, "Who prepared those big balls?" MARIELA asked, "Which ones?" and VIZCAINO said, "The big balls that were recently prepared." MARIELA replied, "Maybe it was Menor and Sonny, because they were the ones here last night." VIZCAINO said, "Hmmm," and MARIELA asked, "Is it because they are tight?" VIZCAINO said, "No, they are tight, but not from the top. It is strange, man." MARIELA then asked, "That stuff is like wet, right? The blue stuff." VIZCAINO affirmed, "Yes, when you

dirty your hands, it leaves it slippery. It's like a grease." MARIELA then said, "That looks shiny." VIZCAINO replied, "That is how it is." They then began talking about their relationship before the call ended.

26. I believe that during this call, VIZCAINO asked MARIELA who had prepared packages of cocaine that he was distributing for CUELLO-REYNOSO ("Who prepared these balls?"). I believe that MARIELA stated that CUELLO-REYNOSO ("Sonny") and CONCEPCION ("Menor") had prepared the drugs for distribution the night prior, and that VIZCAINO said that the drugs were packaged strangely. I believe that MARIELA then commented on the texture of the packaging ("That stuff is like wet, right? The blue stuff"), and that VIZCAINO agreed that the packaging of the cocaine was greasy.

*On June 1, 2024, MARIELA Spoke with LAGRASA about VIZCAINO's New Drug Business.*

27. On June 1, 2024, at 12:36 p.m., MARIELA received an intercepted call on Target Telephone #10 from LAGRASA, who was using telephone number (646) 886-8405. During the call, MARIELA asked, "What is going on with your friend, because I haven't spoken with him for a couple of days now. Remember the time when you said that he was asking you for some and you didn't want to give it to him?" LAGRASA stated that he remembered, and MARIELA said, "Don't get mixed up with him because strange things are happening. Don't give him anything the next time he asks for something." LAGRASA asked, "Is he in trouble?" MARIELA replied, "Weird things are happening right now," and LAGRASA said, "Please give me more details. I just changed my number and did not give it to him. I just remembered that I have some money for you that I went to pick up from your cousin and promised to give to you tomorrow or so." MARIELA stated, "People have been saying that he is taking his clients." LAGRASA asked, "Is he aware?" MARIELA negated and said, "Everything is looking like it's that way. I

asked Johan the other day if he's talked to Anthony. I've been having a weird feeling lately about this situation. He is upset about the fact that he is a traitor. He left the job and didn't call him or anything. He found out through Chanel, who is Alondra's man and told Isael that he has been calling him for product. Chanel called Isael asking why he isn't getting stuff from him since he used to work for him. After that conversation with Chanel, Isael called him and asked him why he was going over his head and calling Chanel when he had offered him to grab some of his product in the past. I know that he called Chanel because he asked me for Chanel's number, but Chanel did not like that he called him to ask for product." They continued to talk about Isael learning that "he" was working on his own because Chanel made him aware. MARIELA asked LAGRASA to decline to work with him in case he called. MARIELA stated that "he" did not take into account that clients could talk. MARIELA and LAGRASA then discussed the fact that they hoped that Isael did not run into "him" because "it [would] definitely be a huge problem." MARIELA said, "I am in shock to see how things ended after Isael gave complete trust to him." LAGRASA agreed, saying, "He used to call him his right-hand man." MARIELA told LAGRASA that she had been calling him since yesterday and asked if the number was active. LAGRASSA stated only Whatsapp is active. MARIELA stated that she had the number saved in her other phone.

28. I believe that during this call, MARIELA asked LAGRASA what was happening with VIZCAINO because she had not spoken with him recently, and that she asked LAGRASA not to supply VIZCAINO with drugs if he requested them ("Don't give him anything the next time he asks for something."). I believe that LAGRASA stated that he had changed his telephone number, and that he had not given VIZCAINO his new number yet. I further believe that MARIELA stated that VIZCAINO was taking drug customers from the CUELLO-REYNOSO

drug trafficking organization ("People have been saying that he is taking his clients."). I believe that MARIELA then recounted that CUELLO-REYNOSO ("Isael") was upset that VIZCAINO had left the organization without speaking with him about his departure, and that CUELLO-REYNOSO had only learned that VIZCAINO had started his own drug distribution business when CHANEL had reported that VIZCAINO had sought to acquire drugs from him. I believe that MARIELA stated that CUELLO-REYNOSO had offered to supply VIZCAINO with drugs and called VIZCAINO to inquire why he wasn't just purchasing drugs from CUELLO-REYNOSO. I believe that CUELLO-REYNOSO's former drug customers also had reported that they were purchasing drugs from VIZCAINO. I believe that MARIELA stated that she was shocked that VIZCAINO's affiliation with CUELLO-REYNOSO had ended so badly given that CUELLO-REYNOSO had given VIZCAINO complete trust and had made VIZCAINO his "right-hand man" in his drug business. I believe that MARIELA and LAGRASSA discussed that his active number was on WhatsApp and that MARIELA had the number stored in her other telephone.

*June 6, 2024, MARIELA Delivered Narcotics Proceeds to a Co-conspirator*

29. On June 6, 2024, at 5:56 p.m., CUELLO-REYNOSO texted Target Telephone #10 from telephone number (978) 943-0858, "Give the 4 thousand to Angel." MARIELA replied via text message, "Yes he told me," followed by, "I told him to ask you if I should give him the other thing." CUELLO-REYNOSO texted, "Yes" followed by "But," "How long until you get here" and "At the location." MARIELA replied, "In like 20 minutes."

30. I believe that during this exchange, CUELLO-REYNOSO instructed MARIELA to give $4,000 in drug proceeds to MEJIA-TORRES at her residence. I believe that MARIELA then replied that she had asked MEJIA-TORRES to inquire with CUELLO-REYNOSO whether

MARIELA should give MEJIA-TORRES the drugs that remained at her residence. I believe that CUELLO-REYNOSO affirmed that she should.

*On June 13, 2024, MARIELA Began Delivering Drugs for CUELLO-REYNOSO.*

31. On June 13, 2024, at 4:00 p.m., MARIELA received an intercepted call on Target Telephone #10 from CUELLO-REYNOSO, who was using telephone number (978) 943-0858. During the call, CUELLO-REYNOSO said, "Okay, if you want to make a couple of pesos, I've got 1,000 and change that you can take. I have a couple of people that need to be seen. You can grab that for yourself." MARIELA said, "That's fine." CUELLO-REYNOSO said, "If you'd like. Because they pulled Ringel over and took the car from him, because of the license." MARIELA said, "Um hum, So, where are you then?" CUELLO-REYNOSO replied, "No, I'm going to have you go to the cross-eyed guy, Papitin's brother, so he can give you the stuff. And after that, I will start sending you the people." MARIELA agreed, and CUELLO-REYNOSO continued, "It's a couple of people. There is one in Lynn. There is a couple of people. Whoever you manage to see, I will give that to you. It's 1,000 and change. There is one in Lynn, another one in, there is a couple. It's 4:00 right now, so I would say by 10:00." MARIELA stated that she had to go pick up Angel in September, and that she was going to start working Uber but had to wait for them to accept. CUELLO-REYNOSO said, "Alright, those people are not hot. You hide it well in there, and there is no problem." MARIELA said, "Alright, send me the address." CUELLO-REYNOSO agreed.

32. I believe that during this call, CUELLO-REYNOSO inquired whether MARIELA wanted to deliver drugs to customers on his behalf ("I have a couple of people that need to be seen"). I believe that CUELLO-REYNOSO stated that a drug distributor ("Ringel") had been arrested due to not having a license, and stated that he had drugs available that MARIELA could

deliver. I believe that MARIELA agreed to start making deliveries and stated that she had intended to start driving for Uber but had not yet been approved as a driver. I believe that MARIELA stated that in September she would have to go to the Dominican Republic to pick up her son ("Angel"), explaining why she was interested in more temporary work. I believe that CUELLO-REYNOSO stated that the customers he was having her make deliveries to were not people who drew law enforcement attention ("are not hot"), so MARIELA was not taking a lot of risk. I believe that MARIELA agreed to make the deliveries and told CUELLO-REYNOSO to send her the information.

*On June 13, 2024, MARIELA Asked UM4889 to Assist with Sending a Wire Transfer.*

33. On June 13, 2024, at 6:05 p.m., agents intercepted a call over Target Telephone #11 during which MARIELA spoke with an unidentified male who was using telephone number (646) 270-4889 ("UM4889"). During the call, MARIELA asked, "What time do you close," and UM4889 replied that he closed at 10:00. MARIELA said, "I am going to Boston and will go to the store around 8:30. To see if I could give you a number so you could wire some money since I'm going to bring one over there. I'm working by Revere." UM4889 said, "But what time are you coming since I have to make a deposit early." MARIELA said, "I will be there like around 8:30." After a brief social conversation, MARIELA said, "I will send you the number so you can do the money transfer for me." UM4889 agreed and said he would do it within five minutes. MARIELA said, "It will be one and a half." UM4889 agreed. MARIELA then said she would send the information via WhatsApp.

34. I believe that during this call, MARIELA asked UM4889 to assist her with sending a wire transfer. I believe that MARIELA had an ongoing relationship with UM4889, and that UM4889 agreed to send the wire without having received the cash from MARIELA. I believe

that MARIELA stated that she would send UM4889 the information for sending the wire via WhatsApp, and that she would bring him the cash at 8:30 p.m. that night.

*June 18, 2024, MARIELA Explained to VIZCAINO That She Had Been Working*

35. On June 18, 2024, at 12:10 p.m., VIZCAINO received an incoming call on Target Telephone #9 from MARIELA, who was using telephone number (617) 690-9031 (Target Telephone #11). MARIELA explained, "I have money here . . . I was broke during the past few days . . . he called me in to work and paid me like I worked the whole week. It was only from Thursday till Sunday, and he paid me for the whole week." MARIELA further explained "I'm going to tell him to have me see him around here. But on foot, right around here. It is way easier for me that way. I feel like more comfortable, you know. Because I'll go on foot, I won't be carrying a lot of things on me, you understand?" VIZCAINO affirmed.

36. I believe that MARIELA had been "called" into "work" by CUELLO-REYNOSO; that the "work" was narcotics distribution; that CUELLO-REYNOSO had "paid" MARIELA for a week's worth of narcotics distribution, even though she only worked for a few days; and that MARIELA was going to tell CUELLO-REYNOSO that she was more comfortable distributing narcotics on foot because she would carry smaller quantities of narcotics at any one time and therefore, would be less vulnerable to law enforcement.

*June 27, 2024, MARIELA Still Working For CUELLO-REYNOSO Distributing Narcotics*

37. On June 27, 2024, at 1:58 p.m., agents intercepted a call on Target Telephone #9, used by VIZCAINO, with MARIELA, who was using telephone number (508) 921-2813. MARIELA told VIZCAINO that she was fighting with "Isael" and that he called her to work and she did not want to. MARIELA explained that Sonny should give her money without her having to do anything.

38. I believe that "Isael" is a reference to CUELLO-REYNOSO; that CUELLO REYNOSO wanted MARIELA to "work" or distribute narcotics on behalf of the organization; and that MARIELA wanted CUELLO-REYNOSO to pay her, whether she was delivering narcotics or not.

39. Based on my knowledge of the investigation, which resulted in federal drug charges against MARIELA, VIZCAINO, CUELLO-REYNOSO, and others, I believe that the Target Devices contain or will lead to evidence, fruits, and instrumentalities of the drug offenses charged. In particular, as evidenced in this Affidavit, MARIELA extensively used cellular telephones to discuss and conduct her illegal narcotics trafficking activities. Because the Target Devices have been kept in a manner in which their contents are preserved, I believe the Target Devices will contain such evidence.

**Probable Cause to Believe that the Target Devices Contains Evidence, Fruits, And Instrumentalities**

40. The Target Devices are currently in the custody of the DEA, as described in Attachments A-1 through A-4. From my training and experience, and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that the Target Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession

41. Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well

as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences. Moreover, drug traffickers commonly use cellular telephones in varied locations, including in their home and outside their home, when they are conducting their illegal drug trafficking activity.

42. Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; sending and receiving communications via varied networks and apps; and accessing and downloading information from the Internet. Wireless telephones

may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

43. Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

44. Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e mail, electronic messages, and updates to online social networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial,

investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

45. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

**CONCLUSION**

46. Based on the information set forth above, I believe that probable cause exists to conclude that MARIELA committed the Target Offenses, and that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the Target Devices described in Attachments A-1 through A-4.

I, Brian Connerney, hereby state under penalty of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

DLC

Brian Connerney

Brian Connerney, Task Force Officer
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this 25 day of September 2026.

Honorable Donald L. Cabell
United States Magistrate Judge
District of Massachusetts

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

**ATTACHMENT A-1**
**Equipment to Be Searched**

The equipment to be searched consists of the following:

a. A black iPhone without a case with a gray/silver Apple logo, which has significant cracks front and back (DEA Exhibit N-60), seized from the residence of Mariela Cuello-Reynoso during the execution of a federal search warrant at 59 Monsignor Patrick J. Lydon Way, Apartment 104, Boston, Massachusetts, on December 5, 2024 ("Target Device 1").

Target Device 1 is in the possession of the Drug Enforcement Administration in Bedford, Massachusetts. The following are photos of Target Device 1.






**ATTACHMENT A-2**
**Equipment to Be Searched**

The equipment to be searched consists of the following:

b. A black iPhone with a clear case with a gray/silver Apple logo, (DEA Exhibit N-61), seized from the residence of Mariela Cuello-Reynoso during the execution of a federal search warrant at 59 Monsignor Patrick J. Lydon Way, Apartment 104, Boston, Massachusetts, on December 5, 2024 ("Target Device 2").

Target Device 2 is in the possession of the Drug Enforcement Administration in Bedford, Massachusetts. The following are photos of Target Device 2.





**ATTACHMENT A-3**
**Equipment to Be Searched**

The equipment to be searched consists of the following:

a. A white/slightly pink iPhone with a clear case with a gray/silver Apple logo, (DEA Exhibit N-62), seized from the residence of Mariela Cuello-Reynoso during the execution of a federal search warrant at 59 Monsignor Patrick J. Lydon Way, Apartment 104, Boston, Massachusetts, on December 5, 2024 ("Target Device 3").

Target Device 3 is in the possession of the Drug Enforcement Administration in Bedford, Massachusetts. The following are photos of Target Device 3.






**ATTACHMENT A-4**
**Equipment to Be Searched**

The equipment to be searched consists of the following:

a. A white iPhone with a slightly patterned case which has rhinestones around the edge of the case, (DEA Exhibit N-63), seized from Mariela Cuello-Reynoso during the execution of a federal search warrant at 59 Monsignor Patrick J. Lydon Way, Apartment 104, Boston, Massachusetts, on December 5, 2024 ("Target Device 4").

Target Device 4 is in the possession of the Drug Enforcement Administration in Bedford, Massachusetts. The following are photos of Target Device 4.








**ATTACHMENT B**
**Items to be Seized**

I. All records, including correspondence, in whatever form, that constitute evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 including all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data, located in the memory of the Target Devices, including but not limited to the following:

A. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

B. Logs of calls (including last numbers dialed, last calls received, time of calls,missed calls, and duration of calls) both to and from the device(s);

C. Text messages and other electronic messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

D. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking and/or money laundering, or individuals engaged in drug trafficking;

E. GPS data;

F. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking, money laundering, or individuals engaged in drug trafficking;

G. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking, money laundering, or individuals engaged in drug trafficking;

H. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

I. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

J. Serial numbers and any electronic identifiers that serve to identify the equipment.